STEPHEN YAGMAN (SBN 69737)
filing@yagmanlaw.net
YAGMAN + REICHMANN, LLP
333 Washington Boulevard
Venice Beach, California 90292-5152
(310)452-3200

Presented on behalf of Plaintiffs,
P.  Boring and Class 1 Putative Class
Members, and I. Dragna and A. Frances,
and Class 2 Putative Class Members

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| **PEOPLE OF THE CITY OF SANTA BARBARA AND OF THE COUNTY OF SANTA BARBARA, WHO ARE UN-HOUSED, AS CLASSES REPRESENTED BY P.  BORING, I. DRAGNA, A. FRANCES**, *etc*., <br><br> Plaintiffs, <br><br> v. <br><br> **CATHY MURILLO, ERIC FRIEDMAN, OSCAR GUTIERREZ, MICHAEL JORDAN, KRISTEN SNEDDEN, ALEJANDRA GUTIERREZ, ARIEL PIERRE CALONNE, PAUL CASEY, BERNARD MELEKIAN, DOHASSEN GAULT-WILLIAMS, GREGGORY HART, ROBERT NELSON, JOAN HARTMANN, STEVE LAVAGNINO, MONA** | 2:21-cv-07305-DOC(KESx) <br><br> **SECOND AMENDED COMPLAINT** <br><br> **For** <br><br> **The Naziesque Criminalization of Homelessness** <br><br> (To Prevent City of Santa Barbara- and County of Santa Barbara-Practiced, Negative Eugenics[1] Against Poor People, Civil Rights Violations, RICO Violations, and Fraud) <br><br> **CLASS ACTION ALLEGATIONS** |

---

[1] Eugenics is the mildest term that could be used to describe defendants' wrongful conduct:  both quasi-ethnic cleansing and quasi-genocide accurately could be used. California, from its very founding, has had a long, tortured, and shameful history of trying to eraticate from the face of the Earth the downtrodden, Exhibit 5 hereto,and that history has continued, unabated, to this day, in this case in Santa Barbara.

| | |
|---|---|
| **MIYASATO, WILLIAM BROWN, CITY POLICE OFFICERS DUPHY** and **BURLEIGH,** and **TEN UNKNOWN NAMED DEFENDANTS, 1-10,** Defendants. | **JURY DEMAND** Judge David O. Carter |

1. Plaintiffs make the following allegations, on information and belief, on behalf of plaintiffs and of the putative class members of two classes, in support of this complaint:

### THE PARTIES

2. Plaintiff **BORING** and Class 1 members are un-housed persons[2] who live and stay in  vehicles that are more than 82 inches in height, or more than 25 feet in length, or 80 inches wide, and who number in the hundreds.

---

[2] Federal law defines the terms "homeless" or "homeless individual" or "homeless person" to include:

> **(1)** an individual or family who lacks a fixed, regular, and adequate nighttime residence;
> **(2)** an individual or family with a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for human beings, including a car, park, abandoned building, bus or train station, airport, or camping ground;
> **(3)** an individual or family living in a supervised publicly or privately operated shelter designated to provide temporary living arrangements (including hotels and motels paid for by Federal, State, or local government programs for low-income individuals or by charitable organizations, congregate shelters, and transitional housing);
> **(4)** an individual who resided in a shelter or place not meant for human habitation and who is exiting an institution where he or she temporarily resided;
> **(5)** an individual or family who--
> **(A)** will imminently lose their housing, including housing they own, rent, or live in without paying rent, are sharing with others, and rooms in hotels or

2

3. Plaintiffs **DRAGNA** and **FRANCES** are homeless persons who live on the streets and sidewalks of the City and County of Santa Barbara; and defendants are: **CATHY MURILLO**, **ERIC FRIEDMAN**, **OSCAR GUTIERREZ**, **MICHAEL JORDAN**, **KRISTEN SNEDDEN**, **ALEJANDRA GUTIERREZ**, all of whom are City of Santa Barbara City council members; Ariel Pierre Calonne, who is or is not City of Santa Barbara City attorney; **PAUL CASEY**, who is the City administrator; **BERNARD MELEKIAN**, who is the City chief of police; **CITY POLICE OFFICERS DUPHY** and **BURLEIGH**; **DOHASSEN GAULT-WILLIAMS**, **GREGGORY HART**, **ROBERT NELSON**, **JOAN HARTMANN**, **STEVE LAVAGNINO**, all of whom are County of Santa Barbara board of supervisors members; **MONA MIYASATO**, who is the County executive office chief executive officer; **WILLIAM BROWN**, who is the County sheriff;

motels not paid for by Federal, State, or local government programs for low-income individuals or by charitable organizations, as evidenced by--
**(i)** a court order resulting from an eviction action that notifies the individual or family that they must leave within 14 days;
**(ii)** the individual or family having a primary nighttime residence that is a room in a hotel or motel and where they lack the resources necessary to reside there for more than 14 days; or
**(iii)** credible evidence indicating that the owner or renter of the housing will not allow the individual or family to stay for more than 14 days, and any oral statement from an individual or family seeking homeless assistance that is found to be credible shall be considered credible evidence for purposes of this clause;
**(B)** has no subsequent residence identified; and
**(C)** lacks the resources or support networks needed to obtain other permanent housing . . . .

42 U.S.C. §11302 (a).  Plaintiffs and class members are within the definition of this section, and chose to call themselves "un-housed," because "homeless" had become a pejorative term.

and **TEN UNKNOWN NAMED DEFENDANTS**, **1-10** (all of whom are referred to collectively as "defendants"), and the **UNKNOWN NAMED DEFENDANTS**, whose true identities presently are unknown, who participated in the wrongful acts alleged hereinbelow, and whose conduct is culpable, and whose unknown names will be replaced by their true identities when those true identities are learned, or are persons and/or entities whose true names presently are unknown, and who may have engaged in some conduct that is culpable with respect to plaintiffs, as set forth hereinbelow.  All defendants engaged in the same conduct by participating in, facilitating, and making the decisions to prevent homeless persons who reside in oversize vehicles from parking them on public streets and/or posting no parking signs, and/or enforcing these no parking restrictions, as set forth hereinbelow, and in harassing homeless people who do not reside in vehicles, as more fully set forth hereinbelow.

4. Defendants each and all are sued in their individual capacities, and, for the claims made under *Monell v. Dep't of Soc. Svcs. of the City of New York*, 436 U.S. 657 (1978), all defendants are sued in their official capacities only.

5.  Plaintiffs and class members all reside in vehicles or on the streets, as described hereinabove.

6.  Defendants and each of them play and played some material role in the acts and/or omissions alleged hereinbelow and in the setting of policies and enforcement of City and County ordinances, and in running and administering the City and County parking enforcement, and in the wrongful conduct set forth hereinbelow.

### ALLEGATIONS COMMON TO EACH COUNT

7.  Each and every allegation set forth in each and every averment herein is incorporated by this reference in each and every other averment and allegation of this pleading.

8.   All acts and/or omissions perpetrated and/or engaged in by each defendant in their individual capacities were done maliciously, callously, oppressively, wantonly, recklessly, with deliberate indifference to the rights allegedly violated, despicably, with evil motive and/or intent, in disregard of the rights of plaintiffs and class members, and in clear violation of the federal Constitution and of the California Constitution, and of controlling federal law, both statutory and common law, as set forth by both the United States Supreme Court and the United States Court of Appeals for the Ninth Circuit.

9.   A.  City of Santa Barbara Municipal Code § 10.44.200, whose enforcement is the basis for some of the claims made in this action against the City defendants, provides as follows:

**10.44.200 Unlawful Parking of Trailers, Mobilehomes [*sic*], Recreational Vehicles, Trucks and Buses.**

A.   STREET PARKING. No person shall park or stand or permit to remain for a longer period than two hours on any street or highway or public alley or on a parkway area between curb and sidewalk, any trailer, semi-trailer, or bus (all as defined in the California Vehicle Code) or any mobilehome [*sic*] (as defined in Title 28 of this code), or any truck used primarily for business or commercial hauling and of a weight in excess of three quarters (3/4) ton capacity, unless such person has a written authorization from the Chief of Police or his or her delegate.

B.   OVERNIGHT PARKING. No person shall park or stand or permit to stand any of the following vehicles: (1) trailer, (2) semi-trailer, (3) bus (all as defined in the California Vehicle Code), (4) mobilehome [*sic*] (as defined in Title 28 of this code), or (5) any vehicle which is capable of greater than 1500 pounds (3/4 ton) cargo capacity on any city street between the hours of 2:00 a.m. and 6:00 a.m. of any day.

C.   RV OVERNIGHT PARKING RESTRICTED AREA. No person shall park or stand or permit to stand any recreational vehicle (as those terms are defined in Section 15.16.060 of this code) between the hours of 12:00 midnight and 6:00 a.m. in the following area of the City: south of the U.S. 101 freeway, and between Castillo Street and the eastern boundary of the City at the Andre Clark Bird Refuge and Coast Village Road (as depicted on the map

attached to this section entitled "RV Overnight Parking Restricted Area, dated February 6, 2007.")

D.   EXCEPTION. This section shall not apply to a commercial truck (as established by a current registration with the state Department of Motor Vehicles):

   1.   While such truck is being loaded or unloaded and such additional time is reasonably required for such loading and unloading operations; or

   2.   When such vehicle is parked in connection with, and in aid of, the performance of a service to or on a property in the block on which such vehicle is parked for a period reasonably necessary to complete such service.

This ordinance is enforced by both the posting of no parking signs and by the police, and is used as a cudgel against unhoused persons who live in their motor vehicles.

B. City of Santa Barbara Municipal Code § 10.44.200, whose enforcement is the basis for some of the claims made in this action against the City defendants, provides as follows:

**10.44.220 Restriction of Oversized Vehicle Parking.**
A.   DEFINITIONS. The following words and phrases shall have the meaning set forth in this subsection:
1.   "Bus" shall mean a bus as defined in California Vehicle Code Section 233; a schoolbus [*sic*] as defined in California Vehicle Code Section 545; a transit bus as defined in California Vehicle Code Section 642; a bus regulated by the Department of Motor Vehicles pursuant to California Vehicle Code Section 34500(b); a tour bus regulated by the Department of Motor Vehicles pursuant to California Vehicle Code Section 34500.1 or, a bus of a charter-party carrier with a valid permit issued pursuant to California Public Utilities Code Section 5375.
2.   "Oversized vehicle" means any vehicle, as that word is defined in California Vehicle Code Section 670, or a combination of connected vehicles (including but not limited to trailers as defined in California Vehicle Code Section 630), which exceeds 25 feet in length, or 80 inches in width, or 82 inches in height, exclusive of such projecting lights or devices as are expressly allowed pursuant to the California Vehicle Code as it now exists

6

or hereafter may be amended. Oversized vehicle shall not mean or include a pickup truck which is less than 25 feet in length and 82 inches in height.

B.    RESTRICTION ON OVERSIZED VEHICLE PARKING. No person shall park or leave standing any oversized vehicle on any streets or portions of streets in areas where the Public Works Director has caused signs or markings giving adequate notice of the restriction to be placed, except as provided in subsection C below.

C.    EXCEPTIONS. Subsection B above shall not apply to:

1.    Any oversized commercial vehicle actively engaged in the loading or unloading of materials, supplies or goods, in the delivery of goods, wares, merchandise, or other materials at an adjacent business or residence for no longer than 30 minutes;

2.    Any inoperable oversized vehicle upon which a person is actively engaged in making emergency repairs, as authorized by Section 10.44.040, for no longer than four hours;

3.    Any vehicle belonging to or under contract with federal, state, or local government authorities, or a public utility, and any emergency vehicles as defined by California Vehicle Code Section 165;

4.    Any bus for no longer than two hours, and any bus in an area specifically posted to allow bus parking for a prescribed time;

5.    Any oversized vehicle properly displaying both a valid distinguishing disabled placard or license plate issued pursuant to the California Vehicle Code and a valid oversized vehicle disability parking permit issued pursuant to subsection D of this section; or

6.    Any oversized vehicle that has been issued and is displaying a temporary oversized vehicle parking permit issued pursuant to subsection E of this section.

7.    Any oversized commercial vehicle that has been issued and is displaying a contractors oversized vehicle parking permit issued pursuant to subsection F of this section.

D.    OVERSIZED VEHICLE DISABILITY PARKING PERMITS. A person may obtain an oversized vehicle disability parking permit for a specific oversized vehicle to be parked at a specific location or locations if he or she demonstrates in writing to the satisfaction of the Public Works Director or his or her designee, on an application form prepared by the Public Works Director and upon payment of a fee prescribed by resolution of the City Council, that they meet each of the following conditions:

1.    The person owns or lawfully possesses an oversized vehicle;

2.     The person is a permanent city resident as determined under the law of California;

3.     The person possesses a distinguishing disabled placard or license plate properly issued pursuant to the California Vehicle Code;

4.     The proposed parking location is necessary to provide access to a specific fixed residential address sited with a lawful dwelling unit at which the person resides or to a specific facility or facilities at which the person is employed or receives services;

5.     The proposed parking location does not create or exacerbate a dangerous traffic safety condition;

6.     The person demonstrates that by reason of the disability which warranted issuance of their California distinguishing placard or license plate, the oversized vehicle is specially equipped and necessary to accommodate the disability of the person seeking the permit so that a reasonable modification to the City's on-street parking regulations is warranted under state and federal law.

Oversized vehicle disability parking permits shall be valid for so long as the person remains disabled, but for no longer than one year. Permits may be renewed provided that the permit holder demonstrates in writing that he or she continues to meet the conditions of this subsection. Oversized vehicle parking with an oversized vehicle disability parking permit shall be subject to all applicable parking restrictions in the California Vehicle Code and the Santa Barbara Municipal Code, including, without limitation, Chapter 7.28 [Street Sweeping], Section 10.44.060 [72-Hour Parking Limit], Section 10.44.200 [Unlawful Parking of Trailers, Mobilehomes, Recreational Vehicles, Trucks and Buses] and Chapter 10.46 [Permit Parking].

E.     TEMPORARY OVERSIZED VEHICLE PARKING PERMITS. A person may obtain a temporary oversized vehicle parking permit for a specific oversized vehicle if he or she demonstrates in writing to the satisfaction of the Public Works Director or his or her designee, on an application form prepared by the Public Works Director and upon payment of a fee prescribed by resolution of the City Council, that they meet each of the following conditions:

1.     The person owns or lawfully possesses an oversized vehicle;

2.     The person is a permanent City resident as determined under the law of California that wishes to temporarily park their oversized vehicle adjacent to their residence; or a commercial business that wishes to do business in the City for a temporary period at a specific fixed residential or commercial

address with the consent of the resident or occupant of that address; or a non-resident temporarily visiting a specific fixed residential address with the consent of the resident of that address;

3.     The proposed parking location is reasonably situated to provide temporary access to a specific fixed residential or commercial address;

4.     The proposed parking location does not create or exacerbate a dangerous traffic safety condition.

A temporary oversized vehicle parking permit shall be valid for no longer than five consecutive calendar days. Permits may be renewed for up to an additional five days provided that the permit holder demonstrates in writing that he or she continues to meet the conditions of this subsection. In no event shall temporary oversized vehicle parking permits be issued to a resident, commercial business, or non-resident for a total period in excess of 10 days within any consecutive 90 calendar day period. Oversized vehicle parking with a temporary oversized vehicle parking permit shall be subject to all applicable parking restrictions in the California Vehicle Code and the Santa Barbara Municipal Code, including, without limitation, Chapter 7.28 [Street Sweeping], Section 10.44.060 [72-Hour Parking Limit],

Section 10.44.200 [Unlawful Parking of Trailers, Mobilehomes, Recreational Vehicles, Trucks and Buses] and Chapter 10.46 [Permit Parking].

F.     CONTRACTORS OVERSIZED VEHICLE PARKING PERMITS.

1.     A person may obtain a contractors oversized vehicle parking permit for a specific oversized commercial vehicle if he or she demonstrates in writing to the satisfaction of the Public Works Director or his or her designee, on an application form prepared by the Public Works Director and upon payment of a fee prescribed by resolution of the City Council, that they meet and agree to each the following conditions:

a.     The person owns or lawfully possesses an oversized commercial vehicle which is registered with the Department of Motor Vehicles as a commercial vehicle and displays identifiable California commercial license plates;

b.     The person possesses a valid business license certificate issued pursuant to Chapter 5.04 of the Santa Barbara Municipal Code and has paid all other applicable City taxes;

c.     The oversized commercial vehicle is necessary for use in the business for which the city business license certificate has been issued;

d.    The oversized commercial vehicle will at no time be parked unattended in any location that creates or exacerbates a dangerous traffic safety condition;

e.    The oversized commercial vehicle will not be parked on the street unattended between the hours of 8:00 p.m. and 7:00 a.m. of the following day, except as provided below when the vehicle is necessary at the parking location, and actually in active use, for work needed to control and repair an emergency situation that poses an immediate threat to public health and safety.

2.    Contractors oversized vehicle parking permits shall be valid for a period of not to exceed a single fiscal year, commencing July 1st of each year. Permits issued after July 1st of any year shall expire on June 30th of the following year and any fees shall be prorated to the nearest month. Permits may be renewed annually effective July 1st of each year, provided that the permit holder demonstrates in writing that he or she continues to meet and agree to the conditions of this subsection.

3.    Contractors oversized commercial vehicles may be parked between the hours of 8:00 p.m. and 7:00 a.m. of the following day only when the vehicle is necessary at the parking location, and actually in active use, for work needed to control and repair an emergency situation that poses an immediate threat to public health and safety. If the emergency location is not immediately apparent from the adjacent public right-of-way, the contractors oversized commercial vehicle shall bear a clearly visible notice in the driver's side window which identifies the emergency location by address and unit number, if applicable, and includes contact information which would allow City safety or enforcement personnel to contact the vehicle operator immediately.

G.    NUISANCE DECLARED. The City Council finds, determines and hereby declares that parking oversized vehicles in violation of this section constitutes an immediate threat to the public health, safety and general welfare, thereby creating a public nuisance. Unlike much of Southern California which was developed following World War II, Santa Barbara's street grid was established in the 18th and 19th centuries at a time before modern oversized vehicles could have been contemplated. Parked oversized vehicles interfere with and obstruct visual access to streets, traffic control signs and signals, other vehicles, pedestrians, bicycles and sidewalks, thereby substantially increasing the risk of collisions between vehicles, as well as collisions between vehicles, bicycles and pedestrians, at intersections, near driveways, and on all streets in the city, including curved

10

roadway sections, narrow streets, busy streets, commercial districts, and neighborhood streets. Parked oversized vehicles create an immediate threat to the public health, safety and general welfare by obstructing visual access to scenic resources, including historic landmarks and natural resources, such as the coastal mountains, beaches, and Pacific Ocean. Parked or stopped oversized vehicles are frequently left with engines, refrigeration systems or generators running, thereby contributing to the deterioration of local air quality and quiet neighborhoods.

H.    INTEGRATION WITH OTHER PERMIT PARKING. Oversized vehicles shall not be considered "eligible vehicles" under Section 10.46.060.A for parking permits issued pursuant to Chapter 10.46. Oversized vehicles with Chapter 10.46 permits that were issued before December 16, 2016 shall be valid until they expire and shall not be renewable thereafter.

I.    RULES AND REGULATIONS. The Public Works Director is authorized to promulgate and publish rules and regulations to interpret and implement this section. (Ord. 5796, 2017; Ord. 5781, 2016)

C.  County of Santa Barbara ordinance § 26-10, Exhibit 1, whose enforcement is the basis for the claims made in this action against the County defendants, provides as follows:

**Sec. 26-10. - Park hours of operation.**

County park facilities will be open for public use no later than 8:00 a.m. in the morning and will be closed at sunset. The director of community services is authorized to establish such other hours of operation as may be determined appropriate by the director of community services. It shall be unlawful for any person to use park facilities outside of the hours of operation posted within or at the entry of a county park.

(Ord. No. 3708, § 1; Ord. No. 4833, § 1, 4-10-2012; Ord. No. 4965, § 1, 5-10-2016)

This ordinance is enforced by both the posting of no parking signs and by the police, and is used as a cudgel against unhoused persons who live in their motor vehicles.

11

These ordinances are unconstitutional on their faces as applied to plaintiffs and class members, all of whom are un-housed persons, because they criminalize both the statuses of being poor and of being un-housed.

D. There may be other City and County ordinances, the numbers of which presently are unknown to plaintiffs, that criminalize being homeless in the City and County of Santa Barbara, and when those ordinances are identified they will be added to the operative complaint.

10.  Attached to the original complaint collectively as Exhibit 1 are exemplars of the standard City- and County-authorized and posted no parking signs that are posted pursuant to the two, quoted ordinances, which prohibit parking, and the posting of which signs is fraudulent, extortionate, and obstructs justice by violating federal law, *see infra*.

11.  There are many hundreds, if not thousands, of these no parking signs all over the City and County of Santa Barbara, each one of them authorized by defendants, and implemented by defendants.

12.  The Eighth and Fourteenth Amendments to the United States Constitution prohibit the threatening of and/or imposition of penalties for merely being on, including sitting, sleeping, lying, or parking vehicles on public property, for homeless individuals who cannot obtain permanent shelter.

13.  Sitting, lying, and sleeping are defined as acts or conditions, that are universal and unavoidable consequences of "being human," as is parking a vehicle that is one's only means of "housing" on a public street.

14.  The conduct of parking an oversize vehicle here is conduct that is involuntary and inseparable from the status of being unhoused -- they are one and the same, given that human beings are biologically compelled to rest, whether by sitting, lying, or sleeping.

15.  As a result, just as the state may not criminalize the state of being "homeless in public places," the state may not "criminalize conduct that is an unavoidable consequence of being homeless -- namely sitting, lying, or sleeping on the streets.

16.  So long as there is a greater number of homeless individuals in the City and County of Santa Barbara than the number of available beds in their shelters, which presently is the case, the City and County of Santa Barbara defendants cannot threaten, extort, penalize, or prohibit, or threaten or attempt to do so, unhoused  individuals, for involuntarily being in, parking in, sitting, lying, and sleeping on public property.

17.  As long as there is no option of sleeping indoors, the City and County governments and defendants may not criminalize indigent, homeless people for being outdoors, parking the vehicles in which they exist on City and County streets, sleeping outdoors, on public property, based on the false premise they these human beings had any choice in the matter. Nor may their property be confiscated or moved away from them.

18.  Resisting the need to be somewhere, to eat, to sleep, or to engage in other life-sustaining activities is impossible. Avoiding public places when engaging in these otherwise innocent conducts is impossible: as long as the unhoused plaintiffs and class members do not have a place where they can lawfully be, the challenged ordinance, as applied to them, effectively punishes them for something for which they may not be convicted under the Eighth Amendment, and hence, the Fourteenth Amendment, to wit, sleeping, eating, parking their vehicles, and other innocent conduct, so that the challenged ordinance, as applied against the homeless is unconstitutional.

19.  The use of the ordinances criminalizes the simple act of being outside on public property, when one has nowhere else she or he can be.

20.  A municipality or county and its officials may not lawfully or constitutionally criminalize such behavior, consistently with the Eighth Amendment, and hence the Fourteenth Amendment, when no sleeping spaces are practically available in a sufficient number of shelters.

21.  So long as there is a greater number of homeless individuals in the City and County of Santa Barbara than the number of available beds in shelters, for the unhoused, the City and the County of Santa Barbara may not legally enforce any ordinances against unhoused individuals, for involuntarily parking, being, sitting, lying, and/or sleeping in any public place.

22. An ordinance violates the Eighth Amendment, and hence the Fourteenth Amendment, insofar as it imposes criminal sanctions against unhoused individuals, for sleeping outdoors or parking their vehicles where all others legally are permitted to park, on public property, when no alternative shelter is available to them.

23.  There is no rational basis to prohibit parking any oversize vehicle that is insofar as it prohibits parking by homeless persons who live in them either between the hours of 2:00 a.m. and 6:00 a.m., or at any other times, at the places at which defendants have posted no parking signs.

24.  The defendants apparently have final decision-making authority as to where to place the no parking signs, and of enforcement of the no parking ordinances.

25.  All of these actions by defendants were done in concert, conspiratorially, and were both attempts to do and the doing of things that constitute fraud, extortion, under both state and federal law, and which obstruct justice, all as set forth more fully herein.

26.  Defendants' actions are a form of government-sanctioned eugenics[3], to alter, by government edict -- here, parking ordinances and their enforcement, a specific population that is disfavored by society and by government, especially in the relatively very-affluent Santa Barbara.

27.  In general, eugenics is the practice of arranging a human population to increase or to decrease the occurrence of characteristics regarded as desirable or undesirable.

28.  The American eugenics movement was formed during the late Nineteenth Century and continued as late as the 1940s, and to a much lesser extent into the late 20th Century.[4]  The American eugenics movement embraced negative

---

[3] "Eugenics" (/juːˈdʒɛnɪks/ *yoo-JEN-iks*; from Greek εὐ- "good" and γενής "come into being, growing") is a set of beliefs and practices that aim to improve the genetic quality of a human population, historically, and here, by excluding people and and/or groups of people judged to be inferior, or promoting those judged to be superior.  In recent years, the term has seen a revival in bioethical discussions, on the usage of new technologies, such as CRISPR (a gene therapy technique) and genetic screening, with a heated debate on whether these technologies should be called eugenics or not.

[4]  Many Americans, especially those born after the WWII, Baby Boomers, and post-Baby Boomer generations, incorrectly believe that Stanford Univ. Professor William Bradford Shockley, Jr. was the father of eugenics.  He was not.  In the 1970s, Shockley contended that a higher rate of reproduction among the less intelligent was having a dysgenic effect, and that a drop in average intelligence would ultimately lead to a decline in civilization. He also claimed that blacks were genetically inferior to whites on an intellectual level -- a view held by the National Football League until June 2021, as a means for denying brain-damaged, Black former players equal compensation to White players in the brain damage class action settlement.  (Shockley was a candidate for the Republican nomination in the 1982 United States Senate election in California.  He ran on a single-issue platform of highlighting the "dysgenic threat" of some racial groups, including African-Americans, to American society.)  Before that, in 1860, prominent, wealthy Californians ruthlessly murdered the Indigenous People of the Yuki Tribe. *See* Exhibit 5 hereto. One of them was California's first chief justice, Serranus

eugenics, as a purported method of improving the human race, and was increasingly discredited as unscientific and racially-biased during the 20th century, especially after the adoption of its doctrines by the Nazis (in order to justify their treatment of Jews, disabled people, and other minority groups).  Incredibly, eugenics was *not* invented by the Nazis, but rather was first employed by "scientists" in New York, principally Charles Benedict Davenport, a Brooklyn-born, Harvard biology professor, and anti-miscegenanistic, who believed that race determined behavior.  That is, the Nazis got eugenics from the Americans.  It is important to recognize that, in America, eugenics was and is a movement used to reduce an undesired population -- as defendants here use their ordinances to push racist, classist, and ableist ideals, rather than a movement that explicitly worked toward the improvement of the human race, against unhoused persons, who are "an undesired population."  *See also*, involuntary sterilization, lobotomization, and William Sheldon's somatotyping, all also pioneered in America.  The English-language term "eugenics" translates to "well-born" from the Greek word, "*eugenes*."  Eugenics reinforces the prejudices of the time by deeming those with desirable genetic traits such as White, of higher economic status, and healthy. On the other hand, those with undesirable traits are identified as non-White, of lower economic status, or  physically or mentally disabled.

29.  Defendants are practicing modern-day eugenics against plaintiffs and class members.  *See also LA Alliance for Human Rights v. City of Los Angeles*, 2:20-cv-02291-DOC-(KESx), Doc. 227 (04/20/21).

30.  Plaintiffs and class representatives **DRAGNA** and **FRANCES** are un-housed persons who live in the streets of Santa Barbara, on sidewalks and

Hastings, after whom the University of California, Hastings College of Law is named. *Ibid*.

16

elsewhere, both of whom are subject to unconstitutional ordinances and their enforcement, and practices that violate their human rights and their constitutional rights.

31. These two unhoused plaintiffs constantly and repeatedly and regularly are sought to be and are expelled from wherever they happen to be on public property.

32.  These two unhoused plaintiffs constantly and repeatedly and regularly have had their personal property and shelter taken away from them by defendants' employees, principally the police.

33. Sanitation workers, and cops manage to keep all un-housed persons off the sidewalks and streets, and those who remain have all of their belongings stolen by defendants' employees.

34. On many, multiple occasions within the past year, plaintiffs' belongings have been stolen by defendants' employees, backed-up by police muscle, sometimes under the guise of a street or sidewalk clean-up, and plaintiffs  presently are unable to identify the workers or the police officers, and often have not  been able to recover their belongings.

34. a. Since at least Oct. 2018, and continuing to Oct. 15, 2021, plaintiff **DRAGNA** has been bullied and threatened repeatedly by City police officers, including defendant officers bicycle officer **DUPHEY** and **BURLEIGH,** has been accused of "trespassing" on public property, taking away her sleeping bag without her permission, threatened by **DUPHEY** for eating food and sitting down on the sidewalk and on a cement ledge in front of 900 State Street, accused of loitering near the City Center, threatened that she had "too many bags," in which her only worldly possessions were kept, had her personal belongings seized without any cause, was arrested by being compelled without her consent to display her i.d., which then was photographed, and with respect to which she did not feel free to

leave, and generally slandered, publicly humiliated, degraded, dehumanized, shamed, labeled, *etc*.

34. b. Plaintiff **FRANCES**, within the last few months and weeks, in two, separate incidents, when she took photographs of police brutality on State Street, one of them of City police pinning a Black man to the ground on a sidewalk and then against a police car, and again outside a Marshals, on the 900 block of State Street, of two City police officers pushing a frail and disabled homeless man who was asleep in a walkway, to the ground, smashing his head and face down to the ground, and the man the next day had stitches around his eye.

35. Attached hereto as Exhibit 1 is the Santa Barbara 2019-20 Grand Jury Report, entitled "Homelessness in Santa Barbara County," and its contents are incorporated herein by this reference.

36. City of Santa Barbara Municipal Code § 9.97.010 prohibits "sitting or lying [as all] on public streets in certain downtown areas on state street," it is unconstitutional on its face and as applied to plaintiffs, and its contents are incorporated herein by this reference.

37. City of Santa Barbara Municipal Ordinance 5948, which purports "affect" § 9.97.010, prohibits "sitting or lying [as all] on public streets in certain downtown areas on state street," it, too, is unconstitutional on its face and as applied to plaintiffs, and its contents are incorporated herein by this reference.

38. Attached the First Amended Complaint, collectively as Exhibit 4 are three Santa Barbara newspaper articles that comment upon the City's so-called "Sit-Lie" policies, as set forth in averments 36 & 37, Santa Barbara Municipal Ordinance 5948 and § 9.97.010, which prohibits "sitting or lying [as all] on public streets in certain downtown areas on state street," and their contents are incorporated herein by this reference, just for informational purposes, and not as allegations.

39. Article III of the Constitution requires a plaintiff who is seeking to invoke the jurisdiction of the federal courts to allege an actual case or controversy.

40. To satisfy the case or controversy requirement, the party invoking a court's jurisdiction must "show that [s]he personally has suffered some actual *or threatened injury* as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.,* 454 U.S. 464, 472 (1982) (emphases added, citation, and internal quotation marks omitted). *See also Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979) (same).

41. In a suit for prospective injunctive relief, a plaintiff is required to demonstrate a real and immediate *threat* of future injury. *City of Los Angeles v. Lyons,* 461 U.S. 95, 101-02 (1983) (holding that the *threat* must be " 'real and immediate' " as opposed to " 'conjectural' or 'hypothetical' "). The key issue is whether the plaintiff is "likely to suffer future injury." *Id.* at 105. *See also O'Shea v. Littleton,* 414 U.S. 488, 496 (1974). Moreover, the "expectations of privacy . . . [of] those traveling in a motor home . . . are significantly greater[,] . . . [because] . . . people actually live [in them,]" *U.S. v. Williams*, 630 F.2d 1332, 1326 (9th Cir. 1980), thus also giving rise to standing.

42. One "cannot challenge the search of [a] . . . motor home on Fourth Amendment grounds unless [s]he demonstrates that [s]he has 'standing' to do so, *i.e.*, that [s]he had a legitimate expectation of privacy in th[at] place[]. [Citation omitted.] To demonstrate a 'legitimate expectation of privacy,' [one] must show that [s]he had an actual subjective expectation of privacy in the . . . motor home, and that society is prepared to recognize that expectation. *United States v. Davis*, 932 F.2d 752, 756 (9th Cir. 1991)." *United States v. Armenta*, 69 F.3d 304, 308

1   (9th Cir. 1995).  Here, society, through its Constitution and laws, is prepared to

2   recognize plaintiff's expectation privacy but, alas, defendants themselves are not.[5]

3       42. "In the ordinary motor home, the glass is tinted or shades can be drawn,

4   so that passers-by cannot peer in[,] . . . many, like the one in this case, have beds

5   and fully equipped baths [unlike the one here], making them in some senses more

6   akin to a house than a car . . . ."  *Ibid.*  All of these factors combine to give plaintiff

7   standing to protect her home, and "[i]n the absence of a warrant, consent, or

8   exigent circumstances, [a police search] runs afoul of the Fourth Amendment."

9   *U.S. v. Santa Maria*, 15 F.3d 879, 880 (9th Cir. 1994).

10      43. "[A]n officer seizes a person when he uses force to apprehend her,"

11  *Torres v. Madrid*, 141 S.Ct. 989, 993 (2021), and plaintiffs have standing for

12  injunctive relief.

13      44. "[T]he 'seizure' of a 'person', . . . can take the form of 'physical force' or a

14  'show of authority' that 'in some way restrain[s] the liberty' of the person." *Id.* at

15  995 (citing *Terry v. Ohio*, 392 U.S. 1, 19, n. 16 (1968)).  "[M]erely touching" is

16  sufficient to constitute a Fourth Amendment violation.  *California v. Hodari D.*,

17  499 U.S. 621, 625 (1991).

18      45. The law has "gr[o]w[n] to recognize arrest [even] without touching

19  through a submission," here involuntary, "to a show of authority[,]"  *Torres*, 141

20  S.Ct. at 996, and "an arrest required only the application of force -- not control or

21  custody -- through the framing of the Fourteenth Amendment."  *Id.* at 997.

22

23  [5] When the people's sovereignty that is delegated to their government is not

24  exercised in accord with the people's will and the laws, then there is tyranny. John
    Locke, Second Treatise on Government (1690), Chapt. XVIII, "Of Tyranny," § 202

25  ("Where-ever Law ends, Tyranny begins, if the Law be transgressed to another's

26  harm.  And whosoever in Authority exceeds the Power given him by the Law, and
    makes use of the Force he has under his Command, to compass that upon the

27  Subject, which the Law allows not, ceases in that to be a Magistrate, and acting
    without Authority, may be opposed, as any other Man, who by force invades the

28  Right of Another.").

46. "[T]he focus of the Fourth Amendment is 'the privacy and security of individuals,' not the particular manner of 'arbitrary invasion[] by governmental officials.'"  *Id.* at 998 (quoting *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523, 528 (1967).

47.  "[T]he Fourth Amendment preserves personal security with respect to methods of apprehension old and new."  *Ibid.*

1      48. "[T]he amount of force,"[6] "remains pertinent in assessing the objective

2

3

_____

4    [6] Defendants' actions also serve as the basis for a due process claims, both
5    procedural and substantive, as to plaintiffs:

6

7       We first reiterate a settled principle: Due process requires that individualized
8       notice be given before an illegally parked car is towed unless the state has a
        "strong justification" for not doing so. *Clement v. City of Glendale*, 518 F.3d
9       1090, 1094 (9th Cir. 2008). *Clement* explained that due process "require[s]
        that notice generally be given *before* the government may seize property,"
10      and held that failing to give notice before towing an unregistered car that had
        a planned non-operation (PNO) certificate3 for noncompliance with the
11      PNO certificate was a due process violation. *Id.* at 1093, 1095–96.

12

13      The general requirement that the government provide individualized pre-tow
14      notice reflects the important private interest at stake when the government
        orders that a private car be towed. *Clement* explained that "having one's car
15      towed, even one that's not operational, imposes significant costs and burdens
        on the car's owner." *Id.* at 1094. And as this Court has repeatedly
16      recognized, "[t]he uninterrupted use of one's vehicle is a significant and
        substantial private interest." *Lone Star Sec. & Video, Inc. v. City of Los
17      Angeles*, 584 F.3d 1232, 1238 (9th Cir. 2009) (quoting *Scofield v. City of
        Hillsborough*, 862 F.2d 759, 762 (9th Cir. 1988)). Towing practices
18      "disproportionately prejudice[e] low-income" populations as towing can
19      "permanently depriv[e] low-income individuals of their vehicles (which
        often serve as their sole source of income or even their home)." Brief of the
20      San Francisco Coalition On Homelessness, The Lawyers' Committee For
        Civil Rights Of The SF Bay Area, and Bay Area Legal Aid as Amici Curiae,
21      Dkt. No. 16 at 11–12. For such individuals, "municipal tow practices often
22      create a 'debt trap for the poor,' " *id.* at 16, because, without access to one's
        car, obtaining and maintaining economic security becomes
23      problematic, *id.* at 11–18. *Clement* held that imposing the burdens associated
24      with a towed car without providing notice "cannot be justified as a means of
25      deterring illegal parking." 518 F.3d at 1094.

26

27    *Grimm v. City of Portland*, 971 F.3d 1060, 1063-64 (9th Cir. 2020).

28

22

intent [of government officers,]" *ibid.*, and even "brief seizures are seizures all the same." *Id.* at 999. The seizures of plaintiffs **DRAGNA** and **FRANCES** were Fourth Amendment seizures, as to which plaintiffs have standing, because they were "a power . . . taking immediate possession of the body" of the plaintiff[s,]" *ibid.*, were "seizure[s] by acquisition of control," and by "the termination of freedom of movement[,]" like "locking [a] person in [a] room." *Id.* at 1001 (citing *Williams v. Jones*, Cas. t. Hard, 299, 301, 95 Eng. Rep. 193, 194 (K. B. 1736)).

---

Seventy years ago, *Mullane v. Central Hanover Bank & Trust Co.* held that notice of a judicial settlement through an announcement in a local newspaper violated due process. 339 U.S. at 319, 70 S.Ct. 652. *Mullane* held that,

> [a]n elementary and fundamental requirement of due process ... is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections ... with due regard for the practicalities and peculiarities of the case.

*Id.* at 314–15, 70 S.Ct. 652. Applying that standard, the Court explained that the notice provided through a local newspaper announcement was "***in***adequate, not because in fact it fails to reach everyone, but because ***under the circumstances it is not reasonably calculated to reach those who could easily be informed by other means at hand***." *Id.* at 319, 70 S.Ct. 652. *Mullane* has since its issuance been consistently understood as establishing a "reasonably calculated" standard that governs the adequacy of notice inquiry. *See, e.g.*, *Robinson v. Hanrahan*, 409 U.S. 38, 39–40, 93 S.Ct. 30, 34 L.Ed.2d 47 (1972) (collecting cases). Here, the continued existence of the no-parking, 2:00 a.m. to 6:00 a.m. signs, plus the lack of notice of the moratorium, create a due process claim. "*Mullane* governs [the] adequacy of notice claim." *Grimm*, 971 F.3d at 1067 (emphases added).

49. A person is seized under the Fourth Amendment "when there is a governmental termination of freedom of [her] movement through means intentionally applied." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989) (emphasis omitted).

50. Freedom of movement is terminated when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (principal opinion).

51. It is recognized that "[t]he law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver," in 2007, the Supreme Court held in *Brendlin v. California*, 551 U.S. 249, 255 (2007), that when a traffic stop occurs the passenger is also seized, because "during a traffic stop an officer seizes everyone in the vehicle, not just the driver[,]" just as plaintiff here was seized on April 14, 2021, when defendants' officers seized the vehicle in which plaintiff was sleeping. *See Villanueva v. California*, 986 F.3d 1158, 1166 (9th Cir. 2021) (same). This seizure took place under the following ordinance:

**10.44.200 Unlawful Parking of Trailers, Mobilehomes [*sic*], Recreational Vehicles, Trucks and Buses.**

A.   STREET PARKING. No person shall park or stand or permit to remain for a longer period than two hours on any street or highway or public alley or on a parkway area between curb and sidewalk, any trailer, semi-trailer, or bus (all as defined in the California Vehicle Code) or any mobilehome [*sic*] (as defined in Title 28 of this code), or any truck used primarily for business or commercial hauling and of a weight in excess of three quarters (3/4) ton capacity, unless such person has a written authorization from the Chief of Police or his or her delegate.

B.   OVERNIGHT PARKING. No person shall park or stand or permit to stand any of the following vehicles: (1) trailer, (2) semi-trailer, (3) bus (all as defined in the California Vehicle Code), (4) mobilehome [*sic*] (as defined in Title 28 of this code), or (5) any vehicle which is capable of greater than 1500

pounds (3/4 ton) cargo capacity on any city street between the hours of 2:00 a.m. and 6:00 a.m. of any day.

C.    RV OVERNIGHT PARKING RESTRICTED AREA. No person shall park or stand or permit to stand any recreational vehicle (as those terms are defined in Section 15.16.060 of this code) between the hours of 12:00 midnight and 6:00 a.m. in the following area of the City: south of the U.S. 101 freeway, and between Castillo Street and the eastern boundary of the City at the Andre Clark Bird Refuge and Coast Village Road (as depicted on the map attached to this section entitled "RV Overnight Parking Restricted Area, dated February 6, 2007.")

D.    EXCEPTION. This section shall not apply to a commercial truck (as established by a current registration with the state Department of Motor Vehicles):

    1.    While such truck is being loaded or unloaded and such additional time is reasonably required for such loading and unloading operations; or

    2.    When such vehicle is parked in connection with, and in aid of, the performance of a service to or on a property in the block on which such vehicle is parked for a period reasonably necessary to complete such service.

Plaintiff Boring faces a substantial risk that he and his vehicle again will be subjected to negative action pursuant to this Ordinance.

52. Plaintiffs **DRAGNA** and **FRANCES** have standing.  *See Crumpton v. Gates*, 947 F.2d 1418, 1423 n. 6 (9th Cir. 1991)[7] ("we have noted in different contexts that a right of action does not arise until a party has a right to enforce its claim, *see, e.g., Norco Constr. Inc. v. King County*, 801 F.2d 1143, 1146 (9th Cir. 1986), and because section 1983's coverage[8] is to be broadly construed to effectuate its remedial purposes, *see, e.g., Golden State Transit v. City of Los Angeles*, 493 U.S. 103, 113 . . . (1989); *Cong. Globe*, 42d Cong., 1st Sess. app. 68

---

[7] Prosecuted by plaintiff's counsel herein.

[8] "§ 1983[] makes liable 'every person' who under color of law deprives another person of h[er] civil rights."  *Pierson v. Ray*, 386 U.S. 547, 554 (1967).

(1871), we have grave doubts about the . . . proposition that infants injured *in utero* and later born alive simply must bear their federally cognizable afflictions without the hope of remedy."). Here, plaintiffs presently have the right to enforce their claims, to effectuate the broad remedial purposes of § 1983.

53. Plaintiffs Frances and Dragna repeatedly have been negatively subjected to Santa Barbara Municipal Code § 9.97.010, and face a substantial risk of again being subjected to it, as they continue to be homeless.

54. That ordinance has no rational basis for distinguishing among people sitting while dining outside, people at a parade, and homeless people sitting to rest their legs, and it bans homeless people from ever sitting down when the City has left them with no alternative, *i.e.*, these people lack adequate shelter, housing, and places to rest, which the City could and should provide to them.

55.-99.  Reserved.

**COUNT 1**
**(Fourteenth Amendment, Equal Protection Violations, against all defendants, in both their individual and official capacities, 42 U.S.C. § 1983)**

100.  The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution prohibits state action that discriminates against a suspect class of persons, and makes a state governmental unit responsible for the equal protection of its citizens, and provides that "nor shall any state . . . deny to any person within its jurisdiction the equal protection of the laws.

100a.  The Equal Protection Clause contains the right of the people to be exempt from unfriendly legislation, exemption from legal discrimination that imply an inferiority in civil society, and which lessen the enjoyment of rights which others enjoy.

100b.  Defendants subject ordinance violated plaintiffs' and class members' right to equal protection of the laws because it is legislation that is unfriendly to them since it is aimed only at them and at no other class of persons, it subjects only

them to legal discrimination -- indeed, it cannot be contested that it is only them against whom it discriminated, it implies their inferiority in civil society, and it lessens their enjoyment of rights which others enjoy.

## COUNT 2
### (*Monell* Violations, against all defendants, in their official capacities, 42 U.S.C. § 1983)

101.  Defendants' wrongful conduct under of color of law occurred so that each defendant knowingly, grossly negligently, recklessly, and with deliberate indifference to the rights allegedly violated, caused to come into being, maintained, fostered, condoned, approved of, either before the fact or after the fact, ratified, and/or took no action to correct, an official policy, practice, procedure, or custom of permitting the occurrence of the categories of wrongs set forth in the immediately-preceding Count, and/or improperly, inadequately, with deliberate indifference to the constitutional or other federal rights of persons, grossly negligently, with reckless disregard to constitutional or other federal rights, failed properly to train, to supervise, to retrain, if necessary, to monitor, or to take corrective action with respect to themselves and/or their personnel with respect to the types of wrongful conduct alleged in this pleading, so that each one of them is legally responsible for all of the injuries and/or damages sustained by plaintiffs and class members, pursuant to the principles set forth in *Monell v. Dep't of Social Services* and its progeny.

## COUNT 3
### (Conspiracy, against all defendants, in both their individual and official capacities 42 U.S.C. § 1983)

102. All defendants and each of them understood and agreed that they all would act in combination in the manners described hereinabove and then overt acts were undertaken to carry out their schemes, both hereinabove and hereinbelow.

//

## COUNT 4

**(Fourteenth Amendment, Due Process Violations, against all defendants, in both their individual and official capacities, 42 U.S.C. § 1983)**

103a.  The Due Process Clause of the U.S. Constitution provides "nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ."

103b. Plaintiffs Frances and Dragna have been physically seized by City officers, based on the sit/lie ordinances, beginning at least in early 2021 and continuing to the present time, and their personal belongings were stolen from them by City officers, with no adequate procedures for their return.

103c.  The defendants' behavior alleged herein is so egregious, so outrageous, that it fairly may be described as shocking to the conscience, and also it is arbitrary and capricious action by the government: it is an exercise of power without any reasonable justification or legitimate governmental purpose:  plain and simple, it is government bullying of those who are least able to defend themselves; it violates the decencies of civilized conduct in a civilized society; it is brutal and offensive, and it does not comport with basic concepts of fair play and decency, so that it violates plaintiffs' and class members' substantive due process rights, because it is the government using its vast power arbitrarily and oppressively.

**COUNT 5**

**(*Monell* Violations, against all defendants, against all defendants, in their official capacities 42 U.S.C. § 1983)**

104a. The specific policies and customs of the City are to rid the City of the homeless population by enforcing the sit/lie ordinances and harassing the homeless and stealing their personal possessions, and this policy amounts to deliberate indifference to plaintiffs' constitutional rights and to fascism, to wit, conservative authoritarianism, and that the policy and custom is the moving force behind the constitutional violations visited on plaintiffs, and Defendants' wrongful conduct under of color of law occurred so that each defendant knowingly, grossly

negligently, recklessly, and with deliberate indifference to the rights allegedly violated, caused to come into being, maintained, fostered, condoned, approved of, either before the fact or after the fact, ratified, and/or took no action to correct, an official policy, practice, procedure, or custom of permitting the occurrence of the categories of wrongs set forth herein, and/or improperly, inadequately, with deliberate indifference to the constitutional or other federal rights of persons, grossly negligently, with reckless disregard to constitutional or other federal rights, failed properly to train, to supervise, to retrain, if necessary, to monitor, or to take corrective action with respect to themselves and/or their personnel with respect to the types of wrongful conduct alleged in this pleading, so that each one of them is legally responsible for all of the injuries and/or damages sustained by plaintiffs' and class members, pursuant to the principles set forth in *Monell v. Dep't of Social Services* and its progeny.

104b.  Defendants' wrongful conduct under of color of law occurred so that each defendant knowingly, grossly negligently, recklessly, and with deliberate indifference to the rights allegedly violated, caused to come into being, maintained, fostered, condoned, approved of, either before the fact or after the fact, ratified, and/or took no action to correct, an official policy, practice, procedure, or custom of permitting the occurrence of the categories of wrongs set forth in the immediately-preceding Count, and/or improperly, inadequately, with deliberate indifference to the constitutional or other federal rights of persons, grossly negligently, with reckless disregard to constitutional or other federal rights, failed properly to train, to supervise, to retrain, if necessary, to monitor, or to take corrective action with respect to themselves and/or their personnel with respect to the types of wrongful conduct alleged in this pleading, so that each one of them is legally responsible for all of the injuries and/or damages sustained by plaintiffs and

class members, pursuant to the principles set forth in *Monell v. Dep't of Social Services* and its progeny.

## COUNT 6

### (**Conspiracy**, **against all defendants, in both their individual and official capacities, 42 U.S.C. § 1983**)

105a. All defendants and each of them understood and agreed that they all would act in combination in the manners described hereinabove and then overt acts were undertaken to carry out their schemes, both hereinabove and hereinbelow.

105b. All defendants and each of them understood and agreed that they all would act in combination in the manners described hereinabove and then overt acts were undertaken to carry out their schemes, both hereinabove and hereinbelow. All defendants, and each of them, understood and agreed and had meetings of their minds, that they all would act in combination in the manners described hereinabove, and then they in concert engaged in the overt acts were undertaken to carry out their schemes, both hereinabove and hereinbelow, by ticketing and threatening the homeless who reside in vehicles and by rousting the homeless who reside on the streets and stealing their personal belongings, so that the conspiracies resulted in overt acts that were done in furtherance of the conspiracies, and were both the causes in fact and the proximate causes of plaintiffs' injuries. There was a meeting of defendants' and others' minds and there were internal agreements between and among defendants as to all of plaintiffs' and class members' claims.

//

//

//

//

//

## COUNT 7

30

**(Fourteenth Amendment, Privileges and Immunities Abridgement Violations, against all defendants, in both their individual and official capacities, 42 U.S.C. § 1983)**

106a.  The Privileges and Immunities Clause of the Fourteenth Amendment provides that "No State shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States."

106b.  California Welfare & Institutions Code §  17000 provides that

> every city . . . shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein . . . .

106c.  This state law provides the substance of a privilege and immunity enjoyed under state law to plaintiffs and class members, and defendants' conduct violates plaintiffs' and class members' Fourteenth Amendment privileges and immunities rights (and this as well violates plaintiffs' and class members' rights to both equal protection and to due process).

## COUNT 8
**(*Monell* Violations, against all defendants, in their official capacities, 42 U.S.C. § 1983)**

107.  Defendants' wrongful conduct under of color of law occurred so that each defendant knowingly, grossly negligently, recklessly, and with deliberate indifference to the rights allegedly violated, caused to come into being, maintained, fostered, condoned, approved of, either before the fact or after the fact, ratified, and/or took no action to correct, an official policy, practice, procedure, or custom of permitting the occurrence of the categories of wrongs set forth in the immediately-preceding Count, and/or improperly, inadequately, with deliberate indifference to the constitutional or other federal rights of persons, grossly negligently, with reckless disregard to constitutional or other federal rights, failed properly to train, to supervise, to retrain, if necessary, to monitor, or to take

31

corrective action with respect to themselves and/or their personnel with respect to the types of wrongful conduct alleged in this pleading, so that each one of them is legally responsible for all of the injuries and/or damages sustained by plaintiffs and class members, pursuant to the principles set forth in *Monell v. Dep't of Social Services* and its progeny.

## COUNT 9
### (**Conspiracy, against all defendants, in both their individual and official capacities, 42 U.S.C. § 1983**)

108. All defendants and each of them understood and agreed that they all would act in combination in the manners described hereinabove and then overt acts were undertaken to carry out their schemes, both hereinabove and hereinbelow.

## COUNT 10
### (**Eighth Amendment, Cruel and Unusual Punishments Infliction Violations, against all defendants in both their individual and official capacities, 42 U.S.C. § 1983**)

109a.  The Eighth Amendment Cruel and Unusual Punishment Clause provides that "nor cruel and unusual punishments [may be] inflicted."

109b.  The Eighth Amendment's Cruel and Unusual Punishment Clause prohibits the imposition, or threat to impose, penalties for sitting, or lying outside, or parking a motor vehicle on a public street, by unhoused persons who cannot obtain shelter, and whether these activities are defined as acts or conditions, they are inseparable from status, they are universal and unavoidable consequences of being human -- they are one and the same thing, and are involuntary conduct that is inseparable from status, because human beings are biologically compelled to rest, whether by sitting, lying, or sleeping, and all of these things must occur some place, here in vehicles banned by the subject ordinance.

109c.  The state may not criminalize and punish, threaten to punish, or attempt to punish the state of being unhoused in public places, nor may it criminalize conduct that is an unavoidable consequence of being unhoused.

109d.  As long as there is no option of sleeping indoors, defendants may not criminalize indigent, unhoused persons for being outdoors, on public property, like streets, on the false premise that that they had a choice in the matter.

109e.  Resisting the need to eat, sleep, or engage in other life-sustaining activities, or parking one's motor vehicle in order to be able to do these things, is impossible.

109f.  Avoiding public streets when engaging in this otherwise innocent behavior also is impossible.

109g.  Unhoused persons who must sleep in their vehicle may not be punished, without the punishment being cruel and unusual, because such persons may not be convicted under the Eighth Amendment for innocent conduct.

109h.  Sleeping in a public place as applied to unhoused persons is unconstitutional.

109i.  Here, defendants' application of their ordinance criminalizes conduct that is not criminal, and thus is unconstitutional.

109j.  An ordinance that makes the use of public property as a temporary or permanent place of dwelling, lodging, or residence, for storage of personal belongings, for cooking, or using temporary structures -- such as vehicles, or as a living accommodation, or any of these activities in combination with one another, is unconstitutional.

109k.  The subject ordinances are only at unhoused persons who live in their campers and RVs, or on the streets, and, as such are unconstitutional.

//

//

## COUNT 11
**(*Monell* Violations, against all defendants, in their official capacities, 42 U.S.C. § 1983)**

110.  Defendants' wrongful conduct under of color of law occurred

so that each defendant knowingly, grossly negligently, recklessly, and with deliberate indifference to the rights allegedly violated, caused to come into being, maintained, fostered, condoned, approved of, either before the fact or after the fact, ratified, and/or took no action to correct, an official policy, practice, procedure, or custom of permitting the occurrence of the categories of wrongs set forth in the immediately-preceding Count, and/or improperly, inadequately, with deliberate indifference to the constitutional or other federal rights of persons, grossly negligently, with reckless disregard to constitutional or other federal rights, failed properly to train, to supervise, to retrain, if necessary, to monitor, or to take corrective action with respect to themselves and/or their personnel with respect to the types of wrongful conduct alleged in this pleading, so that each one of them is legally responsible for all of the injuries and/or damages sustained by plaintiffs and class members, pursuant to the principles set forth in *Monell v. Dep't of Social Services* and its progeny.

**COUNT 12**
**(Conspiracy, against all defendants, in their official capacities, 42 U.S.C. § 1983)**

111. All defendants and each of them understood and agreed that they all would act in combination in the manners described hereinabove and then overt acts were undertaken to carry out their schemes, both hereinabove and hereinbelow.

//

//

//

**COUNT 13**
**(Eighth Amendment, Excessive Fines Imposition Violations, against all defendants in both their individual and official capacities, 42 U.S.C. § 1983)**

112a.  The Eighth Amendments' Excessive Fines Clause provides that "nor shall excessive fines [be] imposed."

112b.  A fine is "excessive" if it is not proportional to and related to the gravity of the offense that it is designed to punish.

112c.  The factors to be considered are the nature and extent of the underlying offense (none), whether the underlying offense is related to other illegal activities (none), whether other penalties may be imposed for the offense (none), and the extent of the harm caused by the offense (none).  Here, defendants created and enforce the ordinance to keep rich, habitated folks, who don't want to be bothered by seeing poor, unhoused folks who are forced to live in vehicles, and none of the four, evaluative factors is applicable, so that the ordinance and its enforcement -- by towing a away an offending vehicle and thus depriving a poor person or her or his home, is both unfounded, draconian, and unconstitutional.

112d.  The horror of a rich person having to endure seeing a poor person's camper or RV, or, indeed, the actual poor person, is not a legitimate reason for enforcement of the subject ordinance.  It is an ugly, neighborhood beautification project.

## COUNT 14
### (*Monell* Violations, against all defendants, in their official capacities, 42 U.S.C. § 1983)

113.  Defendants' wrongful conduct under of color of law occurred so that each defendant knowingly, grossly negligently, recklessly, and with deliberate indifference to the rights allegedly violated, caused to come into being, maintained, fostered, condoned, approved of, either before the fact or after the fact, ratified, and/or took no action to correct, an official policy, practice, procedure, or custom of permitting the occurrence of the categories of wrongs set forth in the immediately-preceding Count, and/or improperly, inadequately, with deliberate indifference to the constitutional or other federal rights of persons, grossly negligently, with reckless disregard to constitutional or other federal rights, failed

35

properly to train, to supervise, to retrain, if necessary, to monitor, or to take corrective action with respect to themselves and/or their personnel with respect to the types of wrongful conduct alleged in this pleading, so that each one of them is legally responsible for all of the injuries and/or damages sustained by plaintiffs and class members, pursuant to the principles set forth in *Monell v. Dep't of Social Services* and its progeny.

## COUNT 15
### (**Conspiracy, against all defendants, in their official capacities, 42 U.S.C. § 1983**)

114. All defendants and each of them understood and agreed that they all would act in combination in the manners described hereinabove and then overt acts were undertaken to carry out their schemes, both hereinabove and hereinbelow.

## COUNT 16
### (**Right to Travel Violations, against all defendants in both their individual and official capacities, 42 U.S.C. § 1983**)

115a.  The right to travel, both intrastate, interstate, and intra-municipal, is both a federal right and a state right, which state right has become a part of the federal right to substantive due process of law, and is a basic human right, and as such is a right implicit in the concept of a democratic society that is one of the attributes of personal liberty under the common law.

115b.  There is a California constitutional, substantive right to travel, and it recognizes the federal right to interstate travel -- the basic right to go from one place to another, and both state and federal courts recognize the right to travel as a fundamental right that is entitled to constitutional protection, under *both* state and federal law.

115c.  The right to intrastate travel, within a municipality, is a federal right, the enforcement of which is the § 1983 remedy, and also it is a federal right because it is incorporated in the substantive Due Process Clause of the Fourteenth

Amendment, the enforcement of which also is the § 1983 remedy, and therefore, plaintiffs and class members may enforce their state right to travel under § 1983. Driving and parking a motor vehicle are inherent parts of the right to travel, and by posting their no parking placards, defendants have unconstitutionally infringed on plaintiffs' and class members' rights to travel.

## COUNT 17
### (*Monell* Violations, against all defendants, in their official capacities, 42 U.S.C. § 1983)

116.  Defendants' wrongful conduct under of color of law occurred so that each defendant knowingly, grossly negligently, recklessly, and with deliberate indifference to the rights allegedly violated, caused to come into being, maintained, fostered, condoned, approved of, either before the fact or after the fact, ratified, and/or took no action to correct, an official policy, practice, procedure, or custom of permitting the occurrence of the categories of wrongs set forth in the immediately-preceding Count, and/or improperly, inadequately, with deliberate indifference to the constitutional or other federal rights of persons, grossly negligently, with reckless disregard to constitutional or other federal rights, failed properly to train, to supervise, to retrain, if necessary, to monitor, or to take corrective action with respect to themselves and/or their personnel with respect to the types of wrongful conduct alleged in this pleading, so that each one of them is legally responsible for all of the injuries and/or damages sustained by plaintiffs and class members, pursuant to the principles set forth in *Monell v. Dep't of  Social Services* and its progeny.

## COUNT 18
### (Conspiracy, against all defendants, in their official capacities, 42 U.S.C. § 1983)

117. All defendants and each of them understood and agreed that they all would act in combination in the manners described hereinabove and then overt acts were undertaken to carry out their schemes, both hereinabove and hereinbelow.

118.-141.  Reserved.

## COUNT 19

**(Racketeer Influenced and Corrupt Organizations, RICO, for Fraud, Extortion, Under Both State and Federal Law, and Obstruction of Justice, against all defendants in both their individual and official capacities)**

142.  By doing the things alleged hereinabove, and/or aiding or abetting them, defendants thereby engaged in and committed the related RICO predicate acts, with similar purposes, results, participants, victims, and methods of commission, over a long and continuing period of time, with a threat of continued racketeering activity, of fraud, extortion, under both state and federal law, and obstruction of justice, and continue to commit fraud, extortion, under both state and federal law, and obstruction of justice, all by using instrumentalities of interstate commerce to accomplish their crimes, and thereby are liable under the civil RICO statute, as set forth hereinbelow.

### Rico Predicate Acts

143.  **Fraud**

The fraud occurred as follows: defendants made the material misrepresentation to the public, including plaintiffs and class members, that it was constitutionally-permissible to implement City ordinance 10.44.200 and County ordinance 26-10, by posting no parking signs, when those representations were false, defendants intended that plaintiffs and class members rely on them, plaintiffs and class members have, in fact, relied on them, and plaintiffs' and class members' reliance has harmed and damaged plaintiffs and class members, who have been unable to and who have not parked their vehicles in which they live in the posted areas, or have parked there and have received parking tickets.

144.  **Extortion**  The extortion occurred as follows: defendants, through the illegal placement of parking placards, have threatened plaintiffs and class members that were they to park their vehicles in which they live in placarded areas that their vehicles would be towed away and penalties would be imposed on them, and that their vehicles could be forfeited, so that because of this extortionate threat, plaintiffs and class members have been extorted not to park their vehicles in contravention of the warning on the placards.

145.  **Obstruction of Justice**  The obstruction of justice occurred by defendants preventing plaintiffs and class members from exercising their federal constitutional rights, as set forth hereinabove. The obstruction of justice occurred by defendants preventing plaintiffs and class members from exercising their federal constitutional rights, all as set forth hereinabove, and by defendants corruptly and/or by threats or force and by any threatening communication, both by the issuance of parking citations and by verbal threats, trying to influence, obstruct, impede, and/or endeavor to influence, obstruct, and/or impede, the due administration of justice, and by defendants knowingly destroying and concealing tangible objects -- Boring's RV and Frances' and Dragna's personal property, with the intent to impede, obstruct, or influence the proper administration of any matter within the jurisdiction of any department or agency of the United States, to wit, this court.

//

//

146.  Each defendant, in his/her own right, and all defendants together, collectively, as well as their employees, who work in and for the City are all enterprises and associated-in-fact enterprises, within the meaning of 18 U.S.C. 1961(4), and therefore are RICO enterprises.

147. Each and all of defendants' activities affect interstate commerce as well as intrastate and interstate travel.

148. Each defendant received and receives income, directly and/or indirectly, by way of insurance premiums, salary, compensation, reimbursement for expenses, *per diem* costs reimbursements, meals, lodging, and/or travel, pensions, *etc.*, from the pattern of racketeering activity alleged herein, and used and uses that income in the acquisition of an interest in and/or operation of the enterprise, in violation of 18 U.S.C. 1962(a), and acquired and/or maintained control over said racketeering enterprise through a pattern of racketeering activities, as set forth herein, in violation of 18 U.S.C. 1962(b).

149. Defendants conducted and/or participated, and continue to conduct and participate in, said enterprises' affairs through a pattern of racketeering activities, in violation of 18 U.S.C. 1962(c).

150. The pattern of racketeering activities included, and continues to include, a continuous pattern and practice potentially involving activities, including the RICO predicates of fraud, extortion, mail fraud, wire fraud, fraudulent concealment, and obstruction of justice, and defendants' defense of the instant action is and will continue to be and will be a continuation and a part of its RICO schemes, so that those who may participate in the defense of this action may make themselves liable under RICO.

151. Defendants' associated-in-fact enterprises constitute a present and continuing threat of harm and additional RICO violations.

152. The enterprises' activities have occurred on more than one, and on many thousands of occasions, over at least the past 35 years and have been done on numerous occasions and constitute at least a thousand separate acts, as set forth hereinabove, not including the acts that will be included as part of the defense of the instant action.

153.  At least one thousand RICO predicate acts have occurred.

154. The wrongful acts described in the matters enumerated hereinabove occurred over a significant period of time, and are related in that they evidence civil RICO predicates, including at least fraud, wire fraud, mail fraud, extortion, and obstruction of justice, and they pose a threat of continued criminal activity, have the same or similar purposes, results, participants and kinds and categories of participants, victims, methods of commission, and are otherwise interrelated by their common characteristics and participants, they are not isolated events, but are both continuous and systemic, and each and all constitute a continuing pattern of racketeering activity and constitute a long term threat of continuing racketeering activity.

155. The activities led to defendants' control of and acquisition over the enterprises and resulted in the injuries to plaintiffs and class members, as alleged herein, which resulted from defendants' participation in and control of the enterprises.

156. By failing to prevent the wrongful conduct herein alleged, misconduct that amounted to racketeering activities, all managerial and non-managerial employees and/or officers and/or agents of defendants engaged in and condoned racketeering activities.

157. The willful and/or negligent mismanagement of the enterprises, with knowledge by defendants charged with management, and potentially other defendants, that they were and continue to be operated as a RICO enterprises, directly caused the harm to plaintiffs, as alleged herein.

158. The enterprises are RICO enterprises because they have hierarchical structures and consensual structures for making decisions, and those structures have an existence beyond that which is necessary to commit the RICO predicate acts alleged herein, in that the hierarchical and consensual structures exist to

accomplish doing business, and the structures for decision-making exist separate and apart from the racketeering activities.

159. Each defendant unlawfully conspired with others, including other defendants, by understanding and agreeing to do and taking overt actions to support the matters hereinabove alleged, to violate the provisions of 18 U.S.C. 1962(b), (c), and (d), and, on information and belief, continued and continue to do so with the aid and assistance of co-conspirators

160. Defendants' actions involve many thousands of City of Santa Barbara unhoused residents and constitute a pattern of racketeering activity and the predicate acts as set forth hereinabove.

161.-199.  Reserved.

## CLASS ACTION ALLEGATIONS

273. Plaintiffs are members of two discrete classes of persons, whose defining characteristics are: **Class 1**, represented by plaintiff **BORING** is an unhoused person who resides in an oversize vehicle that is more than 84 inches in eight and more than 22 feet in length and who negatively is affected by the subject ordinances; and, **Class 2**, is represented by plaintiffs **DRAGNA** and **FRANCES**, who are unhoused persons who live on the streets of Santa Barbara.

274. The first class contains about over 100 people and the second class contains about over about 1,000 people, and each class is so numerous so that joinder of all members of it is impracticable.

275. There are only common questions of fact and of law with respect to all class members of each class, whose vehicles are in imminent jeopardy of being towed, although there is evidence visible of dwelling inside them, Class 1, and Class 2, whose members are in imminent jeopardy of being ousted from their habitations on the streets of Santa Barbara,  and their belongings, shelters, and

property being stolen and/or taken away, often to a place they physically are unable to reach, possibly to reclaim it.

276.  The claims made by the representative parties of each of the two classes, plaintiffs, are typical of the claims of each class member of her or his class.

277.  The representatives of the classes, plaintiffs, more than fairly, vigorously, and zealously will represent and adequately protect the interests of all class members, both themselves and through their zealous attorney.

278.  Prosecution of separate actions by individual class members would create a risk of inconsistent and/or varying adjudications with respect to class members, which would establish incompatible standards for parties opposing the classes, and defendants have acted and will continue to act on grounds generally applicable to every class member in both classes, and the class questions not only predominate but are the only questions that exist, and this action is the far superior manner to other available methods for fairly and efficiently adjudicating the controversies.

279.  Specifically, the class members' interests in individually controlling the prosecution or defense in separate actions do not exist, and there are no anticipated difficulties in managing this class action, as to identification of the amount of damages, identification of class members, and providing actual notice to virtually all class members.

280.  Therefore, this action is maintainable under F.R. Civ. P. Rule 23(a), & 23(b)(1)(A),(B)(1) and (3).

281.  Although there would appear to be no notice requirement, the nature of the notice to be provided to class members would be that the offensive placards would be taken down and to be decided by the court.

**WHEREFORE**, plaintiffs and class members request relief against each defendant as follows:

1.  Compensatory damages for all non-RICO violations, in sums in excess of $200,000.00, exclusive of costs and interest;

2.  Punitive damages, in a sum to be determined by a jury, and as a percentage of the net worth of each defendant, in a sum sufficient to deter future misconduct, and not less than $1,000,000.00 per defendant;

3.  Damages for the RICO violations, and trebling of them;

4.  Injunctive relief, according to law;

5.  The costs of action and interest;

6.  Attorneys' fees; and,

7.  Such other relief as is just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury of all issues.

**YAGMAN + REICHMANN, LLP**

By:  /s/  Stephen Yagman
**STEPHEN YAGMAN**